1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5     FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7  MICHAEL D. BIRD,                     No. C 07-05776 WDB

8          Plaintiff,                   **ORDER ON DEFENDANT'S**
                                        **MOTION FOR SUMMARY**
9                                       **JUDGMENT OR, IN THE**
     v.                                 **ALTERNATIVE, SUMMARY**
10                                      **ADJUDICATION, AND MOTION**
   FOSS MARITIME COMPANY,               **FOR SANCTIONS; ORDER OF**
11                                      **REASSIGNMENT**
          Defendant.
12  _____/

13

14     Defendant Foss Maritime Company moves for summary judgment or, in the

15  alternative, summary adjudication on the claims remaining in the amended complaint:

16  (1) state common law claim for wrongful termination in violation of public policy; (2)

17  Coast Guard Whistleblower Protection Act; and (3) violation of Cal. B&P Code §

18  17200.  Docket no. 64.  The claim under Section 17200 also is the subject of a

19  pending motion to dismiss.  Docket no. 62.  In addition, Foss seeks sanctions against

20  Bird pursuant to Rule 11 for pleading a cause of action under the Whistleblower Act

21  without evidentiary support.  Docket no. 73.

22     On August 27, 2009, the Court held a hearing on Defendant's motions, at which

23  Plaintiff appeared pro se, and Defendant appeared through counsel.  Having

24  considered the papers, evidentiary submissions, and argument presented on the

25  motions, the Court rules as follows.

26

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

# FACTUAL BACKGROUND

Defendant Foss Maritime Company ("Foss") is a marine transportation and logistics service provider.  Declaration of John Butcher in Support of Defendant's Motion for Summary Judgment ("Butcher Decl.") ¶ 3.

The vessel staffing positions at Foss in Northern California are represented by the Inland Boatmen's Union of the Pacific ("IBU") or the Sailor's Union of the Pacific ("SUP").  Butcher Decl. ¶ 5.  To obtain employment as a deckhand on a Northern California vessel at Foss, an individual must first be a member of the IBU or SUP.  *Id.*; Pl's Opp. to Def's Mot. for Summ. J. (docket no. 79), Ex. C (Foss-IBU labor agreement excerpt).  Once a member of either union, an individual may apply to Foss for employment by submitting an application and submitting to a physical examination and drug test.  Butcher Decl. ¶ 5.  If the individual is successful, Foss will offer employment pursuant to the unions' regulations.  *Id.*

Pursuant to the IBU's policies, a new IBU-member employee initially will be categorized as a "casual" worker, then will graduate to "on call" status, which requires a schedule of ten days on call, then five days off.  Butcher Decl. ¶ 6.  An "on call" worker must be available for work during the ten-day time period if called, but the individual is not guaranteed work during that time.  *Id.*  All work assignments are made by the IBU.  *Id.* ¶ 7.  When Foss requires employees for a job, it calls the IBU to request workers.  *Id.* ¶ 8.  The IBU maintains the source list of eligible workers who may be called to work at Foss.  *Id.*  As a condition of employment with Foss, employees must remain members in good standing with the IBU.  Pl's Opp., Ex. C.  Any employee failing to meet this condition is subject to discharge, and the union's request for dismissal for noncompliance must be furnished to Foss in writing.  *Id.*

Plaintiff Michael Bird was a member of the IBU and began working for the Green & White fleet as an observer on March 6, 2006.  He then became a deckhand in late April 2006.  Am. Compl. ¶¶ 10-12; Declaration of Julie Taylor in Support of Def's Mot. for Summ. J., Ex. A (Transcript of 5/28/08 Deposition of Michael D. Bird

("Pl. Depo.")) at 45:5-13.  In August of 2006, Plaintiff became an "on call" deckhand, scheduled on-call for ten days, then off-call for five days.  Pl. Depo. at 49:21-50:18. Plaintiff's supervisor at Foss was Port Captain John Butcher.  Butcher Decl. ¶ 11.

On the evening of April 30, 2006, Plaintiff was assigned to the Tug Keegan Foss for his first deckhand job with Foss.  *Id.* ¶ 12.  According to uncontradicted (at this juncture) allegations in his Amended Complaint, between April 30 and May 2, 2006, Plaintiff observed Captain Duane Systad operating the Keegan Foss as its sole captain for about seventeen hours.  Applicable federal law requires that either two captains or a captain and a mate to be present in the wheelhouse in order to operate a tug more than twelve hours.  See 46 U.S.C. sec. 8104(h) and 46 C.F.R. 15.705(d), discussed in more detail infra.  Am. Compl. ¶¶ 14-16.

On May 1, 2006, at approximately 9:30 p.m., the Tugboat Keegan Foss was pushing the loaded oil barge BMC-10 when the barge ran aground on levy rocks in the Richmond Inner Harbor.  Am. Compl. ¶ 17.  Plaintiff immediately informed Captain Systad, who ordered Plaintiff and the barge tanker-man to look for leaking oil.  *Id.* ¶¶ 18, 19.  After fifteen minutes, Plaintiff reported that he found no leaking oil, although the vessel and its barge had not been docked for a more thorough search.  *Id.* ¶ 19. Plaintiff provided accident details to Captain Systad as Captain Systad reported the accident by telephone to Foss's Port Captain John Butcher.  *Id.* ¶ 20.

Plaintiff alleges that Foss has a systemic practice of permitting and encouraging captains to violate the twelve-hour work rule.  Am. Compl. ¶ 14.  Plaintiff alleges that when he learned about the 12 hour rule some weeks after the May 1st accident, he became concerned that the violation of that rule might have been a contributing cause of that mishap.  He also alleges that he discussed these concerns and the details of the May 1st accident with six to ten Foss employees, including another captain, but that Foss management never followed up to ask him for more information about the matter.  Am. Compl. ¶ 21, 22.  Plaintiff admits that he never directly reported the 12-hour violation to Foss management or to the Coast Guard.  Pl. Depo. 61.

1      Plaintiff further alleges that Foss failed to report the May 1, 2006, accident for
2  about two weeks in an effort to conceal the violation of the twelve-hour rule.  Am.
3  Compl. ¶ 24.  Foss allegedly disclosed the May 1 accident to the Coast Guard only
4  after reporting a subsequent accident on May 13, 2006, when Foss oil barge FDH 35-
5  1, pushed by the tug Richard Foss, hit the Union Pacific Railroad Bridge, located next
6  to the Benicia Martinez Highway bridges.  *Id.* ¶ 25.  Foss concedes that it was fined
7  $5,000 by the Coast Guard for its failure to report the May 1, 2006, accident in a
8  timely manner.  Hearing on Defendant's Motions, August 27, 2009.

9      In addition, Plaintiff alleges (and Defendant does not deny) that Foss has
10  contracts to move oil barges in the San Francisco Bay for FAMM Oil, a division of
11  Chevron, that these contracts are valued between 25 and 35 million dollars, and that
12  because of the two accidents in May of 2006, Chevron Oil placed Foss on safety
13  probation.  Am. Compl. ¶ 27.

14      In July 2006, Plaintiff discussed the May 2006 accidents with Captain K.B., and
15  questioned whether the May 1 oil barge grounding would have been reported if the
16  May 13 bridge accident had not occurred.  Am. Compl. ¶ 28.  Captain K.B. allegedly
17  told Plaintiff that he knew that the captain of the tug Richard Foss, which was
18  involved in the May 13 accident, also was violating the twelve-hour rule.  *Id.*

19      Plaintiff alleges that the Coast Guard submitted a report dated June 2006 to the
20  Harbor Safety Committee of San Francisco Bay about the May 1, 2006, oil barge
21  grounding, and that the report contained two errors: listing the accident date as May 2,
22  and naming the Foss 185 P-3, rather than the BMC-10 oil barge.  Am. Compl. ¶ 29.
23  Plaintiff alleges that Foss provided false information to the Coast Guard in order to
24  hide its systematic practice of violating the twelve-hour rule.  *Id.*

25      Plaintiff alleges that in late September of 2006 he became concerned about
26  another safety issue.  On September 28, 2006, Plaintiff reported for work to the vessel
27  William R.  4/14/09 Butcher Decl. in Response to 3/30/09 CMC Order (Docket no.
28  76) ¶ 11 and Ex. A.  Plaintiff was instructed to regularly check and patch a leak on the

1  forward bow section of the dredge while it was underway.  Pl. Depo. 71: 11-22.

2  During his rounds on September 29, 2006, Plaintiff found a leak on the stern; Foss

3  stopped operation of the sand dredge and returned the vessel to the home port to make

4  the necessary repairs.  *Id*. at 71:23-72:13.  Plaintiff was part of the repair crew that

5  fixed the stern leak, but when Plaintiff asked the crew and the captains about fixing

6  the forward bow leak, he was told that the forward leak would not be repaired because

7  making that repair would require beaching the vessel or moving it to dry dock.  *Id.* at

8  72:20-73:9.

9       Plaintiff tried to call Port Capt. Butcher to voice his concerns about this

10  decision, but the Captain was in a meeting.  So Plaintiff decided to go to Captain

11  Butcher's office to discuss the matter with him face to face.  Within an hour, Plaintiff

12  was in Captain Butcher's office.  Pl. Depo. 73:7-16.   Plaintiff alleges that during this

13  face to face meeting Capt. Butcher verbally threatened and abused him for about

14  forty-five minutes, urging Plaintiff to go away and work somewhere else.  Am.

15  Compl. ¶ 34; Pl. Depo. at 76:4-19, 83:1-6.  Plaintiff contends that Capt. Butcher also

16  angrily told him that he was out of line by raising the possibility of wrongdoing in the

17  May 1, 2006, oil barge grounding in discussions with other Foss employees.  Am.

18  Compl. ¶ 34.  Captain Butcher does not controvert in any of his declarations these

19  accounts of his interactions with Plaintiff on September 29th.

20       Plaintiff does not contend that he ever told Capt. Butcher that he intended to

21  call the U.S. Coast Guard regarding the dredge leak.  Pl. Depo. 93:13-94:5.

22       At the end of the next work day (Saturday, September 30, 2006), Plaintiff was

23  sent home from work by the sand dredge captain, who allegedly told him that he (the

24  dredge captain) had been instructed that Plaintiff would not work the next day.

25  Plaintiff alleges that he had been scheduled to work until Monday morning, October 2,

26  2006, and that he was the only line worker (of four or five) who had been working on

27  the dredge repair project who was told not to report for work on Sunday, despite

28  having been scheduled (earlier) to work (and spend the night) on the dredge until the

5

United States District Court
For the Northern District of California

1  morning of Monday, October 2, 2006.  Am. Compl. ¶ 35; Pl. Depo. 86:14-88:3.

2  Capt. Butcher disputes Plaintiff's statement that he was scheduled to work until

3  October 2, 2006, asserting that crew members on sand dredges generally are not

4  scheduled to work on Sundays.  4/14/09 Butcher Decl. (Docket no. 76) ¶¶ 10, 21 and

5  Ex. A.

6          Plaintiff claims that on October 2, 2006, he telephoned Bruce Reed, a Foss vice

7  president, who was the Designated Person Ashore and therefore legally responsible to

8  ensure that Foss operated safely.  Am. Compl. ¶ 36.  Plaintiff complained to Mr. Reed

9  that the sand barge was unseaworthy because the forward leak had not been repaired.

10  *Id.*  Plaintiff also told Mr. Reed that he felt harassed and threatened by the actions of

11  Capt. Butcher.  *Id.*  According to Plaintiff's account, Mr. Reed told him to wait a week

12  or two for the problem with Capt. Butcher to be resolved.  *Id.*  Plaintiff did not tell Mr.

13  Reed that he intended to report the dredge's condition to the Coast Guard.  Pl. Depo.

14  93:8-12.

15          For his part, Mr. Reed declares that he has "no recollection" of ever speaking to

16  Plaintiff about the unrepaired dredge leak or about anything else.  Mr. Reed also

17  declares that he would have prepared a written record of any safety-related complaint

18  -- but that there is no record of any such complaint by Mr. Bird.   4/22/09 Declaration

19  of Bruce Reed in Response to 3/30/09 CMC Order (docket no. 76) ¶¶ 6, 7, and 8.

20          On October 5, 2006, Capt. Butcher sent an email to Foss staff stating that

21  "Michael Bird is no longer current with the IBU as of their latest list dated 20

22  September and that fact has been confirmed via telephone conversation with the IBU

23  Hall.  Therefore, Mr. Bird cannot be used as call-out except for any source.  If Mr.

24  Bird calls in requesting information, please refer him to me for comment during

25  business hours only.  Thank you."  Butcher Decl. Ex. B.

26          In a declaration submitted in this litigation in March of this year, Captain

27  Butcher asserts that "On approximately October 5, 2006, a Foss dispatcher reported to

28  me that the IBU reported that Mr. Bird failed to pay his dues and therefore Mr. Bird

6

could not be called to work at Foss.  I emailed this information to certain interested Foss employees."

Without evidentiary controversion, Plaintiff insists that he received no notification (oral, electronic, written or otherwise) from the IBU during this period that his dues were in arrears, that he was not in good standing in the Union, or that the Union had any reason to remove him from the "on call" list.  No documentary evidence has been adduced that would suggest that the Union took any initiative or steps in September or October of 2006 to change Plaintiff's status or even to communicate any concern to him about his dues or any other matter that might affect adversely his standing in the IBU or his eligibility to remain in "on call" status.

Plaintiff alleges that removal from the "on call" list and placement in "any source" status constituted, in effect, termination. Workers in the "on call" status were appreciably more likely to be given work and were assigned by the IBU to fill requests for workers according to seniority. In contrast, Foss could select (or refuse to select) anyone it wanted (or didn't want) when Foss turned to the "any source" list. The "any source" list could include union as well as non-union personnel, and all union employees with seniority had to be unavailable before "any source" could be called.  Am. Compl. ¶ 38.  Union membership did not guarantee work from the "any source" list because Foss could exclude persons that Foss did not want from working aboard Foss vessels.  *Id.*  In other words, being relegated to "any source" status was the equivalent of losing any leverage or priority for any work.  As alleged by Plaintiff, to be moved to "any source" status was, for all practical purposes, to be fired.

Plaintiff alleges that Capt. Butcher, behind the scenes, orchestrated Plaintiff's removal from the "on call" list and his relegation to "any source" status.  Plaintiff further alleges that Captain Butcher took this action to retaliate against Plaintiff for expressing concerns about and trying to rectify safety problems -- and to disable Plaintiff from continuing to press safety issues from within Foss.

United States District Court
For the Northern District of California

1     On October 6, 2006, Plaintiff received a telephone message from Capt. Butcher

2   "to call him." Am. Compl. ¶ 39.  Plaintiff did not return Butcher's phone call because

3   he believed that Foss Vice President Reed would contact him to settle these issues.

4   *Id.*; Pl. Depo. 90:11-13.

5     Having received no communication from Vice President Reed, or any calls to

6   report to work, Plaintiff called Foss dispatch on October 18, 2006.  Am. Compl. ¶ 40;

7   Pl. Depo. 88:25-89:5.  The dispatcher told Plaintiff "unofficially" that his name had

8   been removed from the "on call" list for failure to pay his union dues. Am. Compl.

9   ¶ 40; Pl. Depo. 97:3-14 and Ex. 3.  Plaintiff alleges that his dues were not in arrears at

10   this time and were to be paid by deductions from his paycheck from Foss.  Am.

11   Compl. ¶ 42; Pl. Depo. 118:10-119:9.

12     On October 18, 2006, after talking to the Foss dispatcher, Plaintiff claims that

13   he made two or three phone calls to the United States Coast Guard to report that the

14   sand dredge vessel was unsafe and unseaworthy due to the forward leak.  Am. Compl.

15   ¶ 41; Pl. Depo. 94:6-22, 100:7-17.  Plaintiff did not hear back from the Coast Guard,

16   nor did he have any further communications with the Coast Guard on this topic.  Pl.

17   Depo. 95:4-12. There is no evidence that the Coast Guard ever contacted Foss about

18   this matter.

19     After sending him home on September 30th, Foss never called Mr. Bird to work

20   again.  Nor has Foss adduced evidence that it offered work to anyone in "any source"

21   status during October or November of 2006.  For all that the evidence shows, the first

22   time the IBU sent Bird a notification that his dues were in arrears was in November of

23   2006.  But that letter did not indicate that the IBU had removed Plaintiff from "on

24   call" status or from the Union's membership roster.  It wasn't until July of 2007,

25   almost a year later, and after at least three additional notices of dues delinquency were

26   mailed to Plaintiff, that the Union notified him that it had suspended him from

27   membership.  Mast Decl. ¶¶ 9-13 and Exs. C, D, E, F and G.  Finally, in a letter dated

28   September 10, 2007, the IBU notified Foss in writing, as required by the CBA, that

United States District Court
For the Northern District of California

1  Plaintiff was terminated from employment and expelled from the union.  Pl's Opp.,
2  Ex. D.

4  **PROCEDURAL HISTORY**

5      Plaintiff filed a complaint for wrongful termination in the Superior Court for
6  Contra Costa County on October 1, 2007.  Defendant removed the case to District
7  Court on November 14, 2007, based on diversity and federal question jurisdiction.

8      On November 30, 2007, Foss filed its first motion to dismiss, arguing that the
9  first cause of action, alleging violation of California Labor Code Section 1102.5, was
10 preempted by federal maritime law.  On February 1, 2008, Plaintiff, then represented
11 by counsel, filed a statement of non-opposition to the motion to dismiss the first cause
12 of action.  On February 13, 2008, the Court granted Foss's unopposed motion.  After a
13 case management conference on November 24, 2008, the Court ordered Plaintiff, by
14 this time appearing pro se, to file an amended complaint to make clear the legal and
15 factual allegations at issue.  Docket no. 44.  The Court instructed Plaintiff to "keep in
16 mind that each allegation in his Amended Complaint must have a sufficient
17 evidentiary predicate to satisfy Rule 11 in the Federal Rules of Civil Procedure."

18     Plaintiff subsequently filed an amended complaint and filed a motion for
19 reconsideration of the order dismissing the first cause of action.  On December 22,
20 2008, Foss moved to dismiss the amended complaint, or alternatively, to strike the
21 fourth and fifth causes of action.

22     On January 30, 2009, the Court granted Plaintiff's motion for reconsideration
23 on Foss's first motion to dismiss, but held that even the amended complaint failed to
24 state a claim under Section 1102.5.  The Court also ruled, however, that the amended
25 complaint stated a cause of action under state common law for wrongful termination
26 in violation of public policy.  Docket no. 61.  The Court further held that federal law
27 did not preempt this common law cause of action.

28

9

**United States District Court**
For the Northern District of California

1    As to Plaintiff's federal 'whistleblower' claim under 46 U.S.C. § 2114, the

2  Court held that the amended complaint could survive a challenge under Federal Rule

3  of Civil Procedure 12(b)(6) because it alleged that Capt. Butcher took adverse

4  employment action against Plaintiff because Captain Butcher feared that Plaintiff

5  would report alleged safety violations to a federal agency.

6    At the suggestion of the Court, on February 10, 2009, Foss filed a motion to

7  dismiss the cause of action that Plaintiff purported to state under California Business

8  and Profession Code Section 17200.  See Docket no. 61 at 5-6.  That motion, which is

9  based on Plaintiff's failure to pursue a type of remedy that is available under Section

10  17200, is pending and will be addressed in a subsequent section of this Opinion and

11  Order.

12    For reasons set forth in an earlier Order, the Court dismissed Plaintiff's fourth

13  and fifth causes of action for RICO violations. Docket no. 61 at 6.

14    In the pages that follow we primarily address Foss's motion for summary

15  judgment, or, in the alternative, for summary adjudication as to the surviving claims in

16  the amended complaint.  We also rule herein on Foss's motion for sanctions under

17  Federal Rule of Civil Procedure 11 -- a motion that targets Plaintiff's pursuit of the

18  federal whistleblower claim.

19

20    **LEGAL STANDARD ON MOTIONS FOR SUMMARY JUDGMENT**

21    To succeed on a motion for summary judgment, the moving party must

22  establish that, under facts that are not subject to genuine dispute, that party is entitled

23  to judgment as a matter of law.  Federal Rule of Civil Procedure 56(c).  In reviewing a

24  motion for summary judgment, the Court considers the evidence in the light most

25  favorable to the party against whom the judgment is sought.

26    We must grant a motion for summary judgment if, when we consider the

27  evidence in the best possible light for Plaintiff, the evidence is insufficient (as a matter

28

of law) to support a finding by the trier of fact that Plaintiff has proved all required elements of his claims.

**DISCUSSION**

**I.      Federal Whistleblower Claim**

      **A.      Seaman's Protection Act**

The Seaman's Protection Act, 46 U.S.C. §2114, provides for a claim for retaliatory discharge where:

> the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred.

46 U.S.C. 2114(a)(1)(A).  As the District Court of Massachusetts recently stated, "Plaintiffs seeking to invoke the protection of the federal whistleblower statute must establish that their *employer was aware of their intent to report* them to the Coast Guard . . . before an adverse action was taken."  *Baetge-Hall v. American Overseas Marine Corp.*, 624 F.Supp.2d 148, 158 (D.Mass. 2009) (emphasis added) (citing *Robinson v. Alter Barge Line, Inc.,* 513 F.3d 668, 671 (7th Cir.2008)).  It stands to reason that "[a] plaintiff may not bring a claim under 46 U.S.C. § 2114(a) for retaliatory discharge if he did not tell anyone before he was fired that he was planning to complain and reported [the] employer to the Coast Guard only after he was terminated."  *Id*.

      **B.      Absence of Genuine Issue of Material Fact**

Plaintiff alleges that on October 5, 2006, Foss orchestrated his removal from the "on call" list and his relegation to "any source" status in retaliation for voicing concerns about Foss's alleged violation of the 12-hour rule earlier in 2006 and because Foss feared that Plaintiff was about to report to the Coast Guard that in late September the company had chosen not to repair one of the leaks on the sand dredge.

Although Plaintiff has adduced evidence that he raised these safety issues with other Foss employees, he has failed to adduce evidence that would be sufficient to permit a rational jury to conclude that Foss was aware of any intention by Plaintiff to report any safety violation to the Coast Guard (or to any other governmental agency). According to Plaintiff, Foss had known for months that Plaintiff believed that Foss had violated the 12 hour rule in May.  But Plaintiff had not reported any such violation.  Nor has he asserted that he told anyone at Foss, or even implied to anyone at Foss, that he was considering or inclined to report any such violation to any governmental authority.  As far as Foss knew, Plaintiff had not voiced concerns about violations of the 12 hour rule to anyone outside Foss -- even though he had had ample time to do so and even though he was convinced that violations of that rule had occurred and had played a role in causing at least the May 1st accident.

Nor does Plaintiff contend that, before he suffered the alleged retaliation, he threatened to report his concerns about the second dredge leak.  Plaintiff does not even suggest that he intimated or implied to anyone at Foss that he was considering reporting this matter.  Nor does he suggest or assert that he was in fact considering making any such report until he learned, more than two weeks after his face to face meeting with Captain Butcher, that he had been removed from the "on call" list.  The fact that there is no reason to believe, on this record, that Plaintiff was even considering making any report to the Coast Guard before the alleged retaliation occurred, or that he anticipated the adverse employment action, or that he even knew about it until well after it had occurred, increases the likelihood that he neither said nor did anything that would have given his employer the impression that he was "about to" report a safety violation to the authorities.

As we discuss in a subsequent section of this Opinion and Order, there is some evidence that suggests that Captain Butcher wanted to get rid of Plaintiff because Plaintiff was proactive in voicing his concerns about safety and seemed to suspect that Foss was prepared to violate safety rules in order to advance its business interests.

12

1  Moreover, we cannot conclude that it is laughable to suggest that if Captain Butcher

2  wanted to get rid of Plaintiff because he was too ready to voice his concerns about

3  safety, it also might have occurred to Captain Butcher that Plaintiff might report some

4  perceived safety violation to the Coast Guard.

5      The question here, however, is not whether it might be possible that Captain

6  Butcher might have perceived some risk that Plaintiff might report a safety problem to

7  the Coast Guard.  Instead, the question is this: can Plaintiff point to evidence that

8  would be sufficient to permit a rational jury to conclude that Captain Butcher in fact

9  feared that Plaintiff was "about to" report a safety violation to the Coast Guard and

10 that that fear was a substantial factor underlying a decision by Captain Butcher to

11 effectively terminate Plaintiff.  The answer to this question is 'No.'  The inferential

12 gaps that a jury would have to leap to make the necessary findings of fact are so wide

13 that they could be cleared only with substantial assistance from speculation -- and the

14 law will not permit a jury to base findings on speculation.

15     For the reasons set forth above, we conclude that Plaintiff has failed to adduce

16 or point to evidence that would be sufficient to permit a jury to find, rationally, that a

17 fear that Plaintiff was about to report a safety violation to the Coast Guard played a

18 substantial role in causing Captain Butcher to engage in the conduct that Plaintiff

19 alleges resulted in his termination.  For this reason, we must GRANT Defendant's

20 motion for summary judgment on Plaintiff's claim under 46 U.S.C. § 2114.

21

22     **C.    Motion for Sanctions**

23     Foss has followed the procedural steps that are required to position its Rule 11

24 motion for decision by the Court.  Bussi Decl. in Support of Def's Mot. Sanctions, Ex.

25 A.  The target of this motion by Defendant is Plaintiff's claim that he was terminated

26 in violation of Section 2114 of the Seaman's Protection Act (the so-called federal

27 whistleblower statute).  46 U.S.C. § 2114.

28

United States District Court
For the Northern District of California

1    Having considered all of the pertinent submissions from the parties (written and

2  oral), as well as the policies that inform Rule 11, the Court has decided to DENY this

3  motion.

4    Plaintiff has adduced evidence that tends to support his contention that Foss in

5  general and Captain Butcher in particular had reason to fear investigations by

6  authorities of some of Foss' practices -- and that very significant economic interests

7  were at stake if Foss' ability to continue to conduct its business was disrupted by the

8  Coast Guard.  Foss already had been fined $5,000 by the Coast Guard for not timely

9  reporting the May 1st incident -- and the Coast Guard had submitted a report about

10 that matter to the Harbor Safety Committee of San Francisco Bay.  Moreover,

11 Chevron, a source of 25 - 35 million dollars of business for Foss, already had put Foss

12 on safety probation.

13    Plaintiff also has adduced evidence, some of it circumstantial, that tends to

14 support his contention that Captain Butcher had Plaintiff's name removed from the

15 "on call" list and that he did so in retaliation for Plaintiff voicing concerns about

16 safety issues.

17    What Plaintiff has been unable to do is to uncover or otherwise adduce evidence

18 that lends any substantial support to his contention that Captain Butcher had Plaintiff

19 removed from the "on call" list because the Captain feared that Plaintiff was about to

20 report a safety violation to the Coast Guard.   Proceeding without a lawyer, and being

21 out at sea for substantial periods, Plaintiff has not been positioned to use the tools of

22 civil discovery as fully as an attorney might to try to uncover direct evidence, or more

23 compelling circumstantial evidence, to support his suspicion, apparently genuinely

24 harbored, that Captain Butcher and, perhaps, Mr. Reed, in fact feared that Plaintiff

25 would communicate his views about Foss' sloppy safety practices to the Coast Guard.

26 So, to support his federal whistleblower claim, Plaintiff can point at this juncture only

27 to very weak circumstantial evidence -- evidence that is not sufficient to entitle him to

28 try this issue to a jury.

1    But the standard that courts are to apply under Rule 11 is appreciably more

2    forgiving than the standard that courts are to apply under Rule 56.  What Rule 11

3    requires is some evidence.  Such evidence can be circumstantial.  For Rule 11

4    purposes, the evidence need not be terribly convincing.  At least in the absence of

5    strong reasons to believe that a plaintiff's motives are among those condemned by the

6    Rule, courts should exercise restraint when deciding whether to sanction a pro se

7    plaintiff on the ground that the evidence he has been able to muster in support of

8    legally necessary facts is weak (as opposed to non-existent). While Defendant's Rule

9    11 motion presents the Court with a close question, the Court believes that the course

10   most consistent with all the pertinent considerations is to DENY the motion.

11

12   ## II.    Wrongful Termination in Violation of Public Policy

13   The Court previously held that the amended complaint, liberally construed,

14   stated a cause of action under state law for wrongful termination in violation of public

15   policy.  1/30/09 Order Following January 28, 2009 Hearing at 4-5.  California courts

16   have recognized a public policy exception to the at-will employment doctrine.  *See*

17   *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 1089-90 (1992); *Foley v. Interactive Data Corp.*,

18   47 Cal. 3d 654, 665-71 (1988).  State courts have recognized wrongful discharge

19   claims where an employee establishes that he or she was "terminated in retaliation for

20   reporting to his or her employer reasonably suspected illegal conduct that harms the

21   public as well as the employer."  *Holmes v. General Dynamics Corp.*, 17 Cal. App. 4th

22   1418, 1426 (1993) (citing *Collier v. Super. Ct.*, 228 Cal. App. 3d 1117, 1119-20

23   (1991)).

24

25

26

27

28

### A.   Public Policy

To support a wrongful termination claim, the public policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003) (quoting *City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159 (1998)) (internal quotation marks omitted).

Because the Court is entering judgment against Plaintiff on his claim under the federal whistleblower statute, Plaintiff cannot rely on the public policy reflected in that statute to support his common law wrongful termination claim.

Plaintiff also seeks to rely on the "12-hour rule" as the source of a public policy whose alleged violation could support his wrongful termination claim. The statutory basis of the 12-hour rule is found in 46 U.S.C. § 8104(h):

> On a vessel to which section 8904 of this title applies [towing vessels], an individual licensed to operate a towing vessel may not work for more than 12 hours in a consecutive 24-hour period except in an emergency.

46 U.S.C. § 8104(h). The regulatory provision that interprets this statute is set forth in 46 C.F.R. § 15.705(d). That regulation states as follows:

> Subject to exceptions, 46 U.S.C. 8104(h) permits a licensed master or mate (pilot) operating a towing vessel that is at least 26 feet in length measured from end to end over the deck (excluding sheer) to work not more than 12 hours in a consecutive 24 hour period except in an emergency. The Coast Guard interprets this, in conjunction with other provisions of the law, to permit master or mates (pilots) serving as operators of towing vessels that are not subject to the provisions of the Officers' Competency Certificates Convention, 1936, to be divided into two watches regardless of the length of the voyage.

46 C.F.R. § 15.705(d).

We must consider whether the 12-hour rule, as set forth in 46 U.S.C. § 8104(h) and 46 C.F.R. § 15.705(d), meets the requirements for "public policy" under state law to support Plaintiff's wrongful termination claim.

1    The California Supreme Court has ruled that the requisite public policy must be

2 clearly articulated in a statute or constitutional provision. *Green v. Ralee Engineering*

3 *Co.*, 19 Cal.4th 66, 79 (1998). In *Green,* the state Supreme Court considered whether

4 Federal Aviation Administration regulations promoting the proper manufacture and

5 inspection of component airline parts provided a basis for declaring public policy in

6 the context of a retaliatory discharge claim. The *Green* court held that federal

7 regulations promulgated to address important public safety concerns may serve as the

8 source of fundamental public policy for purposes of supporting a common law claim

9 for wrongful termination. *Id.* at 80 and n.6.

10    In 1983, Congress partially revised Title 46 ("Shipping") of the United States

11 Code in order to revise and recodify federal maritime safety laws. House Report No.

12 98-338 (Aug. 1, 1983). Section 8104, governing the manning of vessels, sets forth

13 rules that govern hours and conditions under which covered work may be performed.

14 46 U.S.C. § 8104, Historical and Statutory Notes. This statute clearly sets forth a

15 public policy involving public safety by setting limits on work hours for operators of

16 towing vessels.

17    We find that the 12-hour rule (1) is delineated in statutory, as well as

18 regulatory, provisions; (2) serves the benefit of the public by regulating safe operation

19 of towing vessels; (3) was well-established at the time of Plaintiff's alleged wrongful

20 termination; and (4) is substantial and fundamental. We are satisfied that the 12-hour

21 rule, articulated in 46 U.S.C. § 8104(h) and 46 C.F.R. § 15.705(d), meets the

22 requirements for public policy to support a wrongful termination claim under state

23 law.

24    Although not specifically mentioned in the briefs or pleadings, state and federal

25 regulations governing the safe management of vessels also articulate well-established

26 public policy to ensure safe operation of vessels and protection of the environment.

27 *See* 46 U.S.C. § 3203(a)(2) ("The Secretary shall prescribe regulations which establish

28 a safety management system . . . including instructions and procedures to ensure safe

operation of those vessels and protection of the environment"); Cal. Admin. Code tit.7, § 219(j) ("Each pilot boat shall be surveyed at least once every two years by a surveyor approved by the Board and shall not be operated unless the surveyor has rendered a written report that the boat is in a good and seaworthy condition with respect to its hull and equipment.") and (u) ("A pilot . . . shall, under all circumstances, perform his or her duties in a manner so as not to endanger persons, property or the marine environment or cause damage, injury or loss of life.").  These statutory and regulatory provisions reflect a strong public policy commitment to promoting vessel safety and to preventing injury to persons and to the environment. These policies are substantial and fundamental and provide an independently sufficient source of policy support for Plaintiff's common law wrongful termination claim.

**B.      Elements of Common Law Claim for Wrongful Termination in Violation of Public Policy**

In order to establish a prima facie case of wrongful termination in violation of public policy, Plaintiff must show that (1) he engaged in a protected activity; (2) that his employer subjected him to adverse employment action; and (3) that there is a causal link between the protected activity and the employer's action.  *See Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992).

**1.      Protected Activity**

Foss contends that protected activity does not include tasks required of the employee as part of his job, citing *McKenzie v. Renberg's Inc.,* 94 F.3d 1478, 1486-87 (10th Cir. 1996).  There, the Tenth Circuit held, under the Fair Labor Standards Act, that the hallmark of protected activity is "the assertion of statutory rights (i.e., the *advocacy* of rights) by taking some action adverse to the company - whether via formal complaint, providing testimony in an FLSA proceeding, complaining to

United States District Court
For the Northern District of California

1  superiors about inadequate pay, or otherwise." *Id*. at 1486.  *McKenzie* held that in

2  order to engage in protected activity under the FLSA, the employee must step outside

3  his role of representing the company and either file (or threaten to file) an action

4  adverse to the employer or otherwise engage in activities that reasonably could be

5  perceived as directed towards the assertion of rights protected by the statute.  *Id*. at

6  1486-87.  *Accord Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008);

7  *Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99 (1st Cir. 2004).

8          Our review of decisions in this arena by California courts leads us to conclude

9  that state law does not limit the definition of 'protected activity' (for purposes of this

10 kind of claim) to actions that fall outside an employee's job description or outside the

11 normal reach of her employment responsibilities.  For example, in *Holmes v. General*

12 *Dynamics Corporation*, 17 Cal. App. 4th 1418, 1433 (1993), the court insisted that "it

13 would be clearly improper for G.D. to prohibit employees, particularly employees

14 such as Holmes whose job was to monitor contract performance, from reporting or

15 disclosing suspected violations of governmental contracts."  And in *Collier v.*

16 *Superior Court*, 228 Cal. App. 3d 1117, 1125 (1991), the court wrote that "[an

17 agreement prohibiting an employee from informing anyone in the employer's

18 organization about reasonably based suspicions of ongoing criminal conduct ... would

19 be a disservice ... to the interests of the public and would therefore present serious

20 public policy concerns not present in *Foley*."

21          As these California courts have at least implicitly recognized, it would defeat

22 one of the principal purposes of creating a cause of action for wrongful termination in

23 violation of public policy if courts permitted employers to insulate themselves from

24 liability for this kind of tort simply by including in their employees' job descriptions a

25 duty to be on the alert for actions or practices that violate any law or contravene any

26 regulation.  Thus, proof of the fact that Plaintiff's job required him to report safety

27 violations could not preclude him from bringing this kind of wrongful termination

28 claim.

United States District Court
For the Northern District of California

To be 'protected' for purposes of this kind of tort, a plaintiff's activity need not rise to the level of formally presenting a complaint or accusation either to a governmental agency or to the employer.  California law does not require the employee to have resorted to formal adversarial activity in order to have a viable cause of action on this tort theory.  *Holmes*, 17 Cal. App. 4th at 1433-34 (citing *Hejmadi v. AMFAC, Inc.*, 202 Cal. App. 3d 525 (1988)).  Rather, it is sufficient, under California law, if the employee conveyed "the information in a form which would reasonably alert his or her employer of the nature of the problem and the need to take corrective action."  *Id.* at 1434.

In *Holmes*, the court of appeal held that the plaintiff's communication with his supervisor, a manager, about the employer's violations of the False Statements Act was sufficient to satisfy the element of protesting the employer's illegal conduct to recover on a cause of action grounded in a violation of public policy.  *Id.*  Similarly, in *Hejmadi*, the California court of appeal recognized a cause of action where the plaintiff, a corporate officer, alleged that he was terminated in retaliation for voicing concerns about and taking some steps toward changing the illegal corporate policy of strip searching suspected shoplifters.  202 Cal. App. 3d at 534.

The next questions thus become: has Plaintiff adduced evidence sufficient to permit a rational jury to conclude that, before he suffered adverse employment action, he had engaged in protected activity, as that phrase is defined for purposes of this kind of tort claim, and that his employer knew that he had done so?   We answer both of these questions in the affirmative.

Plaintiff has averred (at this point without contradiction) that he discussed his belief that Captain Systad had violated the twelve hour rule before running the barge aground on May 1, 2006, with between six and ten other Foss employees during the summer of that year and that at least one of these employees was a captain who acknowledged that violations of the twelve hour rule were common on Foss vessels.  Plaintiff further asserts that in at least some of these discussions he suggested that

**United States District Court**
For the Northern District of California

1    Foss might not have reported the May 1st incident at all if another Foss vessel had not

2    been in a separate accident on May 13th.  In addition, Plaintiff alleges, again without

3    contradiction from Defendant, that when he was being berated on September 29th

4    Captain Butcher insisted that Plaintiff had been out of line to discuss Foss's violations

5    of the 12 hour rule with other employees of the company.

6         We encounter a similar evidentiary situation when we turn our attention to the

7    forward leak on the dredge that Foss decided not to fix on September 29th.  Plaintiff

8    claims that he voiced his concern about and objection to that decision to the captain of

9    the dredge, then went to Port Captain Butcher's office to press the point.  Captain

10   Butcher does not deny that Plaintiff expressed his view, during their meeting on the

11   29th, that the dredge would be unseaworthy if the forward leak was not fixed.

12   Instead, Captain Butcher indicates that he rejected Plaintiff's views on the matter --

13   being persuaded to the contrary, he says, by the views of three engineers.

14        Given this evidentiary record, a rational jury might well find that Plaintiff had

15   voiced concerns about and opposition to at least two kinds of allegedly unsafe

16   practices by Foss before he was relocated to the "any source" list – and that Port

17   Captain Butcher both knew about and was unhappy with the fact that Plaintiff had

18   been so expressing himself.

19

20                      **2.     Adverse Employment Action**

21        Foss contends that Plaintiff was not "terminated" by anyone -- but that he

22   simply walked away from his job when he learned that his IBU dues were in arrears.

23   According to Foss, Plaintiff simply chose, without coercion from anyone, not to bring

24   his dues current.

25        We must take care at this juncture to distinguish (and consider separately) two

26   different issues.  The first is whether Plaintiff has adduced sufficient evidence to

27   permit a rational jury to conclude that he suffered a type of adverse employment

28   action that California law would deem a form of "termination" for purposes of this

United States District Court
For the Northern District of California

1   kind of tort.  The second issue is whether Plaintiff has adduced sufficient evidence to

2   permit a rational jury to conclude that actions by Foss were a substantial factor in

3   causing the change in Plaintiff's employment status.

4        Could a jury conclude, on the evidence of record at this juncture, that Plaintiff

5   suffered a kind of adverse employment action that qualifies under California law as a

6   "termination" for purposes of this cause of action?

7        California courts have recognized the doctrine of 'constructive discharge' in

8   order to address attempts by employers to insulate themselves from wrongful

9   termination claims by refraining from formally or directly firing an employee, but

10  drastically changing how she was treated or down-grading her work situation so as to

11  all but force her to abandon her job.  *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238,

12  1244 (1994), *abrogated on other grounds*, *Romano v. Rockwell Internat'l, Inc.* (1996)

13  14 Cal.4th 479, 498 (1996).  Under California law, a demotion, standing alone, does

14  not constitute a constructive discharge.  But California courts would acknowledge that

15  at some point a demotion could be so radical or could so severely contort or limit an

16  employee's work that the demotion became the legal equivalent of a formal firing.

17  *See, e.g.*, *Scotch v. Art Institute of California-Orange County, Inc.*, 173 Cal. App. 4th

18  986, 1022 (2009); *Palacio v. Progressive Ins. Co.*, 244 F.Supp.2d 1040, 1053 (C.D.

19  Cal. 2002) ("Intolerability [of working conditions] is typically reserved for the jury

20  which can consider all of the circumstances of the employment relationship.")

21  (citations omitted).

22       Plaintiff does not contend that he was formally "fired."  Instead, he claims that

23  the adverse action he suffered consisted of being removed from the "on call" list and

24  relegated to "any source" status.  Could a jury conclude that that change, in the

25  circumstances of this case, qualified as a termination?  The answer is yes.

26       Plaintiff claims, and Foss does not dispute, that being on the "on call" list

27  conferred significant employment rights or privileges that candidates for employment

28  who were in "any source" status did not enjoy.  While inclusion in the "on call" list

did not guarantee any particular amount of work, it improved substantially the likelihood that opportunities to work would be offered and it guaranteed access to work based on seniority.   The Union was the primary source of workers for Foss vessels, and the Union could designate for assignments from the "on call" list only its members and only in order of their seniority.  According to Plaintiff's unchallenged proffers, the effect of removal from the "on call" list was at least to drastically reduce opportunities to work.

Moreover, relegation to "any source" status caused the power to determine whether an individual would be offered work to be re-located from the Union to the employer, thus exposing workers in the "any source" category to the whims or biases of the employers – and to the very real prospect of never being called at all. Thus, in the real world, being removed from the "on call" list constituted a very substantial adverse employment action.

Moreover, given how (by uncontradicted allegation) Port Captain Butcher berated him on September 29th, given the fact that he was the only deckhand level employee to be sent home from the repair work on the 30th, and given Mr. Reed's alleged failure to take any action in response to Plaintiff's complaints to him about the forward leak and about how Captain Butcher had threatened him, it would not have been transparently irrational for Plaintiff to believe that it was extremely unlikely that in the future Foss would offer him employment on the occasions that Foss was free (under the CBA) to draw workers from the "any source" category.

In short, a rational jury could conclude, on the record before us, that it was reasonable for Plaintiff to conclude that he was, for all practical purposes, terminated when he was removed from the "on call" list and relegated to "any source" status.

///

///

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### 3.     Caused by Foss

Has Plaintiff has adduced sufficient evidence to permit a rational jury to conclude that actions by Foss were a substantial factor in causing the change in Plaintiff's employment status?

In addressing this issue, we consider evidence with two different targets. One target is the Union – its standard practices and its interaction with Plaintiff in connection with his employment with Foss.  The second target is Foss itself.  There is evidence from both of these arenas that tends to support Plaintiff's contention that his removal from the "on call" list was the result of actions behind the scenes by Foss and was not attributable to any initiatives taken or any independent decisions made by the IBU.

The IBU Rotation Schedule for the period August 31 to October 31, 2006, shows Plaintiff as third in Deckhand Call Order.  Rosenberg Decl. ¶ 10 and Ex. E. Foss has presented no evidence that the IBU amended the shipping list of Union members eligible for the rotation schedule at any time before October 31st.

There also is no evidence that it was a standard practice for the IBU to suspend members when their dues were arguably in arrears for a few days.  There is evidence that members' dues were delivered to the IBU in two different ways: (1) by the member submitting his dues payment to the Union directly and independently, and (2) by automatic deduction from the member's paychecks.  It appears that Plaintiff's dues for August 2006 were paid by automatic deduction from his paycheck.  It is not at all clear why no such automatic deduction was made from his paychecks in September 2006.

It also is noteworthy that Plaintiff's dues were very modest – either $45 or $60 a month.  So the amount of the dues created no significant incentive for Plaintiff to walk away from his job at Foss.

Plaintiff's dues for August were recorded as paid on the last day of that month.  Thus, by October 5th, his dues for September, which he reasonably could have

24

expected to have been taken out of his paychecks, were at most five days late.  There is no evidence that anyone from the Union took any initiative in October of 2006 to contact Plaintiff about this possible tardiness.  It wasn't until November of 2006 that the Union bothered even to send Plaintiff a notice of delinquency.  And it wasn't until July of the following year that the Union notified him (by letter) that he was suspended from membership for failing to pay his dues.

When the Union finally decided to expel Plaintiff from membership, in September of 2007, it <u>mailed</u> the written notice of its action <u>to Foss</u> -- declaring, in the notice, that Michael D. Bird "shall be terminated from employment with <u>Foss San Francisco</u>."  In so notifying Foss of this action by the Union, the Union was complying with provisions of the CBA that required it to notify an employer in writing if the Union was taking action that resulted in an individual losing his right to work.

There is no evidence that the Union notified Foss in writing that there was any infirmity in Plaintiff's standing in the Union or in his eligibility for work until September of 2007, a year after he was removed from the "on call" list.

When we turn to evidence relevant to this issue that has been proffered by Foss we encounter several curiosities.  The first (and only) contemporaneous 'writing' that Foss has offered on this question is the email that Captain Butcher sent to various Foss dispatchers (and others) on October 5, 2006.  The body of this email, in its entirety, consists of the following:

> "Michael Bird is no longer current with the IBU as of their latest
> list dated 20 September and that fact has been confirmed via
> telephone conversation with the IBU Hall.  Therefore, Mr. Bird
> cannot be used as call-out except for any source.  If Mr. Bird
> calls in requesting information, please refer him to me for
> comment during business hours only."

Butcher Decl. Ex. B.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    What are some of the 'curiosities' that attend this message?  First, we know of

2  no provision in the CBA under which the Union could make such a significant change

3  in a member's status simply by a phone call.  Second, no evidence has been proffered

4  that it was normal Union practice (despite the CBA) to communicate by telephone a

5  decision by the Union to make such a change in a member's status.  Third, there is no

6  evidence that the Union would decide to make such a change solely on the ground that

7  the member's most recent dues payment was five days late.  There has been no proffer

8  that it was common practice for the IBU to suspend members for such brief tardiness

9  in paying dues.

10    Fourth, in this email Captain Butcher claims that the "latest" IBU list (on which

11  Plaintiff allegedly was no longer current) was dated September 20th.  Why the IBU

12  would generate such a list in the middle of a month (before the dues for that month

13  could become delinquent) is not clear.   Moreover, because it is undisputed that

14  Plaintiff's dues for the preceding month had been paid by August 31st, there is no

15  evidence that his dues were in fact in arrears on September 20th.  Furthermore, the

16  IBU had listed Plaintiff as eligible for work at Foss for the August through October

17  2006 rotation schedule, without (as far as we know) a peep of protest or a hint of

18  concern about his dues.

19    We also find curious Captain Butcher's phraseology in this email message.  He

20  announces that Plaintiff is "no longer current with the IBU" and then asserts that "that

21  fact has been confirmed via telephone conversation with the IBU Hall."  He does not

22  assert, in this writing that is so close in time to the event, that the IBU called Foss with

23  this news, or that Foss learned about Plaintiff's change in status in a communication

24  that the Union initiated -- as one would expect because under the CBA it is the Union

25  that designates workers for "on call" assignments.  Instead, Captain Butcher's

26  phraseology suggests that someone from Foss "confirmed" Plaintiff's removal from

27  the "on call" list by telephoning the Union.  It was only much later, after Plaintiff

28  began challenging Foss's conduct, that Captain Butcher clearly asserted that someone

United States District Court
For the Northern District of California

(unidentified to this day) from the IBU called a Foss dispatcher (allegedly Mark Carlsen, no longer with Foss) to inform him about the change in Plaintiff's status.

In sum, because of all the significant questions it raises, Captain Butcher's email could be a source of inferential support for Plaintiff's claim that the initiative to have Plaintiff removed from the "on call" list was taken by Foss, not by the Union.

There is additional possible support for that inference in other evidence offered by Plaintiff.  Plaintiff was the only deckhand-level worker who was told not to return to work on September 30th -- the day after he alleges that Captain Butcher threatened to 'hammer' him for voicing safety concerns and pressed him to 'go away and work somewhere else.'  Am. Compl. ¶ 34.   And Plaintiff alleges that when he was told not to return to work on October 1st, the dredge captain told him that "he had been instructed for me to not work Sunday."  Pl. Depo. 86.  *See also* Pl's Opp. To Mot. Summ. J., Ex. F (Transcript of Administrative Hearing on January 11, 2007) at 22. While Foss suggests that the Dredge Superintendent, then Chris Rhea, was responsible for determining "the work schedule for the crew members," (4/14/09 Butcher Decl. ¶ 14), and that it was Mr. Rhea who decided "to send the crew home on September 30, 2006," Foss presents no declaration from Mr. Rhea (who is no longer with the company) affirming that it was he who decided that, of all the deckhands who worked on the dredge repairs on the 30th, only Plaintiff would not be called to return to work the next day.

A jury also might find some circumstantial support for Plaintiff's claim that Foss orchestrated his removal from the "on call" list in Plaintiff's testimony about his interaction with Foss Vice President Bruce Reed.  While Mr. Reed declares that he remembers nothing about any communication from Mr. Bird, Plaintiff declares that he spoke with Mr. Reed by phone on October 1st or 2nd, reporting his concerns about the decision not to repair the forward leak on the dredge and protesting the way Captain Butcher threatened and berated him.  Plaintiff also has alleged that Mr. Reed, who was the corporate officer responsible for safety, told Plaintiff that the matters he was

1  reporting were serious and advised him not to interact with Captain Butcher for a

2  week or two to give Mr. Reed an opportunity to try to resolve the issues Plaintiff had

3  raised.

4      In view of the fact that Captain Butcher's email (notifying Foss dispatchers that

5  Plaintiff was not eligible for work) is dated October 5, if a jury believed that Plaintiff

6  had this phone conversation with Mr. Reed on October 1st or 2nd, and that Mr. Reed

7  never made any record of it and never again communicated with Plaintiff, a jury might

8  view this sequence of events as some circumstantial evidence that it was at Foss's

9  initiative that Plaintiff was removed from the "on call" roster.

10     Plaintiff's account of his conversation with Mr. Reed also could help a jury

11 understand why Plaintiff did not take any action to try to return to work until October

12 18th, when he called a Foss dispatcher.  No one contends that Captain Butcher, or

13 anyone associated with Foss or with the Union, informed Plaintiff about the alleged

14 delinquency of his dues between October 1st and October 18th.  Thus, during this

15 period, there is no reason to believe that Plaintiff knew his dues might be in arrears or

16 that there was any reason to worry about his work status.

17     According to Plaintiff, however, by the 18th he had become sufficiently

18 concerned about not hearing anything from Mr. Reed and not being called again to

19 report to work that he telephoned a Foss dispatcher named Raymond to ask when he

20 might expect a call to return to work.  Plaintiff testified during his deposition that

21 when he asked Raymond why he (Plaintiff) had not been called back to work,

22 Raymond "at first . . . didn't want to tell me, and then over the phone he said, 'I heard

23 unofficially you didn't pay your dues.'" Pl. Depo. 97.  In response to a follow-up

24 question, Plaintiff testified: "I don't know if he used 'Unofficial' or 'Don't quote me,'

25 but he sort of put a disclaimer out there." *Id*.  While not the most powerful evidence

26 ever proffered, this testimony about the dispatcher's alleged discomfort with the

27 circumstances, or his apparent ambivalence about the rationale he was providing for

28 Plaintiff not being called for work, could be seen as additional circumstantial support

1  for an allegation that it wasn't really the Union that had caused Plaintiff's status to

2  change, but Foss.

3        Given all of the evidentiary considerations described in the preceding

4  paragraphs, we conclude that whether actions by Foss were a substantial factor in

5  Plaintiff's removal from the "on call" roster is a triable issue of fact.

6

7        **4.    Motive**

8        The final element that Plaintiff must prove to prevail on a cause of action for

9  wrongful termination in violation of public policy is that a substantial factor leading

10  Foss to orchestrate the change in Plaintiff's status was its desire to retaliate against

11  Plaintiff for voicing concerns about Foss's safety practices – and to disable him from

12  doing so in the future.  Given the Court's description, in the preceding pages, of the

13  evidence Plaintiff can adduce in this case, it will come as no surprise that the Court

14  also finds that this is a triable issue.

15        Plaintiff declares that when he voiced his concerns about the decision not to fix

16  the forward leak on the dredge, Captain Butcher, his supervisor, responded by angrily

17  threatening and berating him -- not only for questioning the judgment of the Foss

18  'engineers' about the leak, but also, over the preceding months, for repeatedly

19  discussing Foss' alleged violation of the 12 hour rule and suggesting that Foss never

20  would have reported the May 1st grounding if a Foss vessel had not been involved in

21  another accident on May 13th.  According to Plaintiff, Butcher exclaimed that

22  Plaintiff was "out of line" for discussing these matters and that he should "go away

23  and work somewhere else."  Am. Compl. ¶ 34.  See also the Transcript of the

24  Administrative Hearing on January 11, 2007, where Plaintiff testified that, during this

25  exchange, Captain Butcher said, among other things, "Why are you still here?"  "Why

26  don't you leave?"  and "I can be fair.  But if you piss me off, I'll hammer you."

27

28

United States District Court
For the Northern District of California

1    Also as recounted above, Plaintiff claims that he reported both his safety

2  concerns and his treatment by Captain Butcher to Vice President Bruce Reed a few

3  days before he was removed from the "on call" list.

4    The close temporal proximity of these interactions with Foss management, as

5  recounted by Plaintiff, to the curiously explained removal of Plaintiff from the "on

6  call" roster, could support a rational inference that there was a causal connection

7  between Plaintiff's safety protests and his relegation to "any source" status.  The

8  Ninth Circuit has recognized that "'causation can be inferred from timing alone where

9  an adverse employment action follows on the heels of protected activity.'"  *Van*

10  *Asdale v. Internat'l Game Technology*, No. 07-16597, --- F.3d ----, 2009 WL

11  2461906, slip op. at 11088 (9th Cir., August 13, 2009) (quoting *Villiarimo v. Aloha*

12  *Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)).

13

14    In sum, for the reasons stated during the hearing and set forth in more detail in

15  this Order, the Court finds that Plaintiff has marshaled sufficient evidence to get to a

16  jury on all the essential elements of his claim for wrongful termination in violation of

17  public policy.  The Court therefore must DENY Defendant's motion for summary

18  judgment on this claim.

19

20  **III.    Unfair Competition Claim**

21    Plaintiff has failed to make a showing that he might be entitled to any form of

22  relief that is theoretically accessible under Section 17200 of the Business and

23  Professions Code.  *See Vikco Ins. Serv., Inc. v. Ohio Indemnity Co.*, 70 Cal. App. 4th

24  55, 67-68 (1999).  He has not made any showing that might suggest that he could

25  satisfy the prerequisites for injunctive relief or for restitution.  The Court therefore

26  must GRANT Defendant's motion for summary judgment on Plaintiff's unfair

27  competition claim.  The Court also hereby GRANTS Defendant's pending motion to

28  dismiss Plaintiff's unfair competition claim (docket no. 62).

**United States District Court**
For the Northern District of California

**CONCLUSION**

For the reasons set forth above, IT IS HEREBY ORDERED AS FOLLOWS:

1.  Defendant's motion for summary judgment is DENIED as to Plaintiff's claim under state law for wrongful termination in violation of public policy.

2.  Defendant's motion for summary judgment is GRANTED as to Plaintiff's federal whistleblower claim and as to his unfair competition claim.  Those claims are hereby dismissed, with prejudice, from the amended complaint.

3.  Defendant's motion to dismiss the unfair competition claim is GRANTED.

4.  Defendant's motion under Rule 11 to sanction Plaintiff for pursuing his claim under the federal whistleblower statute is DENIED.


IT IS FURTHER ORDERED that due to the undersigned's retirement on October 2, 2009, the Clerk of the Court shall randomly reassign this action to another Magistrate Judge of this Court.

**IT IS SO ORDERED.**

Dated: August 31, 2009

WAYNE D. BRAZIL
United States Magistrate Judge

31